## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Deidre Sherell Jackson, | Case No. 0:20-cv-749 (KMM/TNL) |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND** |
| | **CONCLUSIONS OF LAW** |
| Minnesota Department of Human Services, | |
| Defendant. | |

Deidre Jackson has worked for the Minnesota Department of Human Services (hereafter, "DHS" or "the agency") for nearly 20 years. In 2019, Ms. Jackson, already in a supervisory role at DHS, applied for a new and more senior director position at the agency. Ms. Jackson, who is black, was a finalist but was ultimately passed over for the promotion. Instead, DHS promoted another internal candidate, who is white.

On March 18, 2020, Ms. Jackson filed a complaint in this Court alleging employment discrimination under Title VII of the Civil Rights Act because of her color and race in the agency's failure to promote her, in the terms and conditions of her employment, and as retaliation against her. *See*, *e.g.*, ECF 1 at 3–4. On October 4, 2022, the Court granted summary judgment in favor of DHS on all but Ms. Jackson's failure–to–promote claim. *See generally* ECF 153. Starting on October 23, 2023, a three–day bench trial was held on Ms. Jackson's surviving claim, in which the Court heard testimony from a number of witnesses for both parties. *See* ECF 201–203. The Court, having heard and considered the

1

evidence and arguments of counsel, now makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1.     The Findings of Fact set forth herein are undisputed or have been proven by a preponderance of the evidence.

2.     To the extent the Court's Conclusions of Law may include what may be considered Findings of Fact, they are incorporated herein by reference

### I.     The Parties

3.     DHS is an agency of the State of Minnesota. ECF 197 (Stip. Trial Facts) ¶ 1.

4.     Ms. Jackson is an employee of DHS. *Id.* ¶ 2.

5.     Ms. Jackson is a black woman who identifies as African American. *See*, *e.g.*, Trial Transcript[1] 82:13–14, 83:15–16.

### II.     Ms. Jackson's Employment at DHS

6.     Ms. Jackson began working for DHS on April 4, 2005, as a Health Care Claims Specialist in the Claims Division. Stip. Facts ¶ 1.

7.     Ms. Jackson moved into the Behavioral Health Division as a Policy Specialist in 2012. Trial Tr. 13:23–14:10.

8.     On April 27, 2016, Ms. Jackson was promoted to the position of Mental Health Program Administrative Supervisor, a position she still holds. Stip. Trial Facts ¶ 2.

---

[1] The full trial transcript is docketed as three volumes ECF Nos. 205–207. Pagination is continuous from volume to volume. Citations herein are to page and line numbers within the full transcript, without regard to volume number.

9.      Ms. Jackson's employment history at DHS reflects increased responsibility and recognition over time, and she has received praise and positive feedback from her colleagues and supervisors.

10.     For example, Dominique Jones, Jackson's former supervisor, testified that Jackson was considered a resource to the Behavioral Health Division on questions of Medicaid policy and payments. Trial Tr. 174:14–175:10.

11.     Performance reviews from 2016 through 2018 indicate that she performed well and never received a rating score indicating that she had failed to meet standards for her position. Exs. P-02, P-04, P-06.

12.     And in 2017, Ms. Jackson received an achievement award that included a cash prize and recognition for her "strong contributions" to DHS. Ex. P-03.

13.     But Ms. Jackson's employment history at DHS also includes disciplinary incidents, tension, and disputes between her and the agency.

14.      For example, in April 2019, Ms. Jackson received a "Letter of Expectations" identifying professional communication expectations and directing her to complete coaching. Ex. P-14.

15.     A Letter of Expectations is not formal discipline at DHS. Trial Tr. 412:6–10. Instead, it is a prospective step, putting an employee on notice that discipline may be administered in the future if needed improvement does not occur. *Id*. 412:12–16.

16.     Ms. Jackson maintains that she has always communicated professionally in the workplace and was aware of the policies requiring her to engage respectfully at DHS. *Id*. 75:21–76:2, 103:5–104:9.

17.    Ms. Jackson objected to the Letter of Expectation's coaching requirement, describing it as an effort to make her "be more acceptable for white people" and to "talk white." *Id*. 78:7–79:12, 106:5–7, 108:18–22; Ex. P-19. The Letter of Expectations was later amended to require training instead. Trial Tr. 78:7–79:12; Ex. P-19.

18.    In May 2019, Ms. Jackson was informed she had been named the subject of an investigation. Ex. P-18. In August 2019, Ms. Jackson was informed that the investigation was complete and its findings were inconclusive. *Id*.

19.    Ms. Jackson was suspended for one day with pay on December 27, 2019. Trial Ex. P-78; Trial Tr. 68:1–11. The suspension stemmed from a complaint concerning Ms. Jackson's interaction with one of her subordinates on August 30, 2019, and was investigated by an outside law firm. Tr. Exs. P-42, P-71; Trial Tr. 81:18–24, 110:23–112:7, 117:17–118:15. The investigation concluded that Jackson "raised her voice" when speaking with the subordinate, which was overheard by others, and "used an adverse tone." Ex. P-68 at 54.

20.    Ms. Jackson's suspension was later rescinded and removed from her personnel file in October 2020 after Ms. Jackson successfully grieved the discipline. Ex. P-71, P-83; Trial Tr. 81:18–82:8.

21.    The most substantial dispute between Ms. Jackson and her employer involved her use of a state–issued cell phone and the charges incurred in that use.

22.    DHS issued Ms. Jackson a cell phone for work as a supervisor at the agency. Trial Tr. 50:24–51:1.

23.     The state of Minnesota has a policy concerning the "Appropriate Use of Electronic Communication and Technology," which applies to the use of state cell phones. Ex. P-08; Trial Tr. at 424:17–24. The policy permits the "[l]imited and reasonable incidental use" of state electronic devices, which is defined as "minimal duration in length and frequency." Ex. P-08 at 1. Managers and supervisors are "responsible for ensuring that employees appropriately use all electronic tools through training, when necessary." *Id.* at 5. The policy applies to intentional violations, providing that an employee who "intentionally fails to comply" shall be subject to discipline. *Id.*; Trial Tr. 404:9–405:15, 436:8–16.

24.     This policy applied to Ms. Jackson's use of the cell phone. Trial Ex. P-8; Trial Tr. 424:3–25.

25.     At times, Ms. Jackson would use the hotspot on her work phone to connect her work computer to the internet. Trial Tr. 51:7–10.

26.     Ms. Jackson was not formally trained on using her work phone or the hotspot on the work phone, but she had a general understanding of how to use her DHS–issued cell phone hotspot. *Id*. 51:2–3, 53:8–9, 53:20–54:3, 96:25–97:9.

27.     Over the course of August and October 2018, records indicate that Ms. Jackson incurred data overages totaling $7,786.88 on her DHS–issued cell phone. Trial Ex. P-9 at 2; Trial Ex. P-11; Trial Tr. 98:5–99:7.

28.     After being informed about the overages, Ms. Jackson stated that she forgot to turn off her DHS–issued cell phone hotspot, including overnight, but denied that she intentionally violated state policy that applied to her use of the cell phone. Trial Ex. P-9;

Trial Tr. 51:7–16, 96:15–22. Ms. Jackson voluntarily turned in the cell phone, without being asked to do so. Trial Tr. 58:17–19.

29.     Based on the data overages, DHS initiated an investigation to determine whether Ms. Jackson violated the Use of State Property policy. Trial Ex. P-9; Trial Tr. 425:15–426:10.

30.     The investigation was conducted by Jan Brenk, an investigator with DHS. Trial Ex. P-9; Trial Tr. 426:13–18. Investigators make fact findings but do not determine whether the facts establish a policy violation. Trial Tr. 427:1–7.

31.     The completed investigation was sent to Sean Tolefree, DHS's Deputy Director of Human Resources in 2019. *Id.* 405:2–15, 422:4–9. Mr. Tolefree reviewed the investigative findings with DHS's Work Incident Review Committee to determine whether a policy violation had occurred and, if so, what discipline to recommend. *Id.* 420:14–21, 422:10–16, 427:8–10.

32.     The investigation confirmed that Ms. Jackson had incurred data overages totaling $7,786.88 on her DHS–issued cell phone. Trial Ex. P-9; Trial Transcript 426:2–10, 427:8–14.

33.     Mr. Tolefree was concerned by the amount of the data overages, which were the highest he had ever seen. *Id.* 441:8–22. He was also concerned about investigative findings suggesting Ms. Jackson had allowed someone else to use her DHS–issued cell phone hotspot, potentially posing risks to the security of private DHS data. *Id.* 430:22–431:13.

34.     After reviewing the investigation report, Mr. Tolefree recommended

suspending Ms. Jackson. Trial Ex. P-9; Trial Tr. 427:18–429:6. However, Assistant DHS Commissioner Claire Wilson chose to issue Ms. Jackson a written reprimand instead of a suspension. Trial Tr. 428:13–429:2, 501:15–20.

35.     Ms. Jackson was issued a written reprimand on February 15, 2019, for violating state policy by incurring the data overages. Trial Ex. D-2; Trial Tr. 427:18–429:15. Mr. Tolefree was involved in drafting the reprimand. Trial Tr. 429:4–6.

36.     In addition to the written reprimand, DHS revoked Ms. Jackson's telework privileges. Trial Ex. D-2; Trial Tr. 96:5–12. Ms. Jackson has not been reissued a DHS cell phone since the written reprimand. Trial Tr. 96:5–9.

37.     Ms. Jackson understood that the February 2019 written reprimand would be added to her DHS personnel file. *Id.* 120:20–22, 429:16–18.

38.     By letter dated February 26, 2019, Behavioral Health Director Maisha Giles requested that Ms. Jackson repay the $7,786.88 in data overages to the state of Minnesota. Trial Ex. P-11; Trial Tr. 92:8–24, 98:7–14, 321:23–324:1. The letter included a Consent to Payroll Collection form. Trial Ex. P-11; Trial Tr. 101:3–11.

39.     Jackson's union instructed her not to consent to the payroll deductions. Trial Tr. 55:24–56:13.

40.     Ms. Giles thereafter asked Ms. Jackson to sign the Consent to Payroll Collection form, but Ms. Jackson refused. Trial Tr. 100:21–24, 101:6–14.

41.     On January 9, 2020, Mr. Tolefree again requested that Ms. Jackson consent to repay the data overages via deductions from her future earnings via an official DHS letter. Trial Ex. P- 79; Trial Tr. 430:7–21, 442:1–9. Mr. Tolefree copied the Office of the

Legislative Auditor on this letter because it allegedly involved misuse of public funds. Trial Tr.  431:25–432:5.

42.     Ms. Jackson has not repaid any of the $7,786.88 in data overages and testified that she has no intention of doing so. *Id.* 101:15–23.

43.     Other DHS employees have had data overages on their state cell phones and Mr. Tolefree cannot recall whether they were subject to discipline for those overages. *Id.* 441:8–13, 441:20–22.

### III.     The Moving Home Minnesota Director Position

44.     On August 15, 2019, DHS posted a job opening for the Moving Home Minnesota ("MHM") Director position. Stip. Facts ¶ 4. The minimum qualifications for the position included supervisory or other leadership experience and four years of professional experience in grant management or policy experiences for public programming. Ex. P-36 at 10–11. The "preferred" qualifications for the position included a master's degree in public policy or a human–services related field, experience working with federal–state human services programs, and understanding of service delivery systems and funding streams for older adults and/or people living with disabilities. *Id.*

45.     Anab Gulaid was the hiring manager for the MHM Director position. Trial Tr. 119:15–17; 228:8–25. Ms. Gulaid was hired in February 2019 as a Deputy Assistant Commissioner over the Community Supports Administration, which included Behavioral Health. *Id.* 119:18–19, 223:1–7, 224:1–13. Ms. Gulaid was in an "appointed" position at DHS and, therefore, did not have the same union representation as employees like Ms. Jackson. *See id.* 66:8–16, 328:8–330:5.

8

46.     Ms. Gulaid lacked experienced making new hires or promotions at DHS and worked with Talent Acquisition Specialist, Zong Thao, on recruitment for the MHM position. Ex. P-20; Ex. P-87 at ¶¶ 1–2; Trial Tr. 229:7–11, 230:23–231:2, 385:12–20, 387:16–18.

47.     Ms. Gulaid encouraged Ms. Jackson to apply for the MHM position. Trial Tr. 35:18–36:5, 41:8–10, 316:11–19. On August 19, 2019, Ms. Jackson applied on August 19, 2019. Stip. Facts ¶ 5.

48.     On September 17, 2019, Ms. Thao referred 23 candidates who met the minimum qualifications for the MHM position, including Ms. Jackson, to Ms. Gulaid. Trial Ex. P-32; Trial Tr. 239:3–10, 387:8–18.

49.     Ms. Gulaid reviewed resumes for each of the 23 candidates and sorted them into the following categories, reflecting whether they should receive an interview: "Yes," "Maybe," and "No." Exs. P-34 at 1, P-35 at 1; Trial Tr. 243:19–23. Ms. Gulaid redacted the candidates' names and asked several others at DHS to review the candidates' resumes. Trial Tr. 243:2–244:4. Every resume reviewer responded "yes" when asked if Ms. Jackson should be offered an interview for the position. Ex. P-38 at 3. Ms. Jackson was the only one of the 23 candidates to receive unanimous support to be interviewed. *Id.*

50.     On September 25, 2019, Ms. Gulaid notified Daniel Pollock, then the Assistant Commissioner for the Older Adults Administration, that she planned only to interview five candidates. Ex. P-35 at 1; Trial Tr. 244:9–13, 465:10–12.

51.     In an email, Ms. Gulaid identified her "top five" candidates to Mr. Pollock "based on their comprehensive skills." Trial Tr. 245:3–8; Ex. P-35 at 1–2. Ms. Jackson was

among the "top five," and Ms. Gulaid highlighted Ms. Jackson's experience with "CMS rules" and "Medicaid benefit[s]." Ex. P-35 at 2; Trial Tr. 245:14–23, 246:19–21.  Mr. Pollock agreed Ms. Jackson should be interviewed. Exs. P-35 at p. 1, P-86 ⁋ 1; Trial Tr. 467:22–25.

52.    In the same email exchange, Ms. Gulaid and Ms. Pollock agreed that Amy Petersen, who was later selected for the MHM position, should not be offered an interview, determining that at least five other candidates, including Ms. Jackson, were more qualified. Ex. P-35 at 2; Trial Tr. 248:22–24, 279:25–280:2, 468:1–5.

53.    Ms. Gulaid invited five applicants for a first interview, including Ms. Jackson. Ex. P-36; Trial Tr. 45:19–46:12. Following Jackson's interview, Gulaid believed Jackson was qualified for the MHM Director role and the hiring committee agreed to move her candidacy forward. Trial Tr. 253:24–254:16.

54.    In mid-October 2019, Ms. Gulaid invited Ms. Jackson and two candidates from the initial interview round to second interviews. Exs. P-39, P-40; Tr. Tran 46:3–6, 253:24–254:9, 316:24–317:2, 468:16–25. In the second interviews, Ms. Gulaid evaluated a candidate's leadership potential, whereas the first interview evaluated competency. Trial Tr. 325:17–19.

55.    Ms. Gulaid informed Ms. Jackson that her second interview went well. *Id.* 47:11–17, 255:24–256:1.

56.    After completing the second interviews, Ms. Jackson was Ms. Gulaid's "top candidate." Ex. P-41 at p. 2; Trial Tr. 274:3–14, 388:5–12. Ms. Gulaid concluded that Ms.

Jackson had the requisite skills relating to Medicaid policy and rules and services for people with disabilities and older adults. Trial Tr. 251:5–12.

57.     Ms. Gulaid decided to proceed with checking the references and personnel files for Ms. Jackson and one other candidate, Heidi Hamilton. *Id.* 257:13–16, 271:17–24, 272:14–17. But Ms. Jackson was Ms. Gulaid's top candidate, and Ms. Gulaid was "rooting for" her to obtain the MHM Director job. *Id.* 274:3–6, 287:5–10.

58.     It was Ms. Gulaid's job to check candidate references and HR's job to check personnel files for the internal candidates. *Id.* 266:16–18, 271:23–272:2.

59.     Ms. Gulaid notified Ms. Jackson she was one of the finalists for the role and Ms. Jackson provided Ms. Gulaid with three references on October 22, 2019. *Id.* 47:18–48:10, 119:25–120:2; Ex. P-44.  All of Ms. Jackson's references provided positive support for Ms. Jackson's candidacy. Trial Tr. 269:11–12, 510:12–511:8.

60.     After checking Ms. Hamilton's references, Gulaid decided not to advance Ms. Hamilton because she was hesitant about whether Ms. Hamilton would be able to move the program forward. *Id.* 270:16–271:11. By contrast, Ms. Gulaid testified Jackson "had a vision" and "an idea about how to … move forward [and] to grow the program." *Id.* 274:3–14.

61.      Ms. Gulaid asked Ms. Thao to review Ms. Jackson's DHS personnel file, which is standard practice for internal DHS job candidates. *Id.* 272:7–17, 387:19– 389:14, 416:11–417:22. Ms. Thao was trained on how to conduct personnel file reviews, and she followed normal practices and policies and procedures in reviewing Ms. Jackson's DHS personnel file. *Id.* 401:9–402:3, 417: 18–22.

62.     At the time she reviewed Ms. Jackson's personnel file, Ms. Thao had never met Ms. Jackson and did not know her race. Trial Tr. 289:19–24, 400:14–21.

63.     In reviewing Ms. Jackson's personnel file, Ms. Thao discovered Ms. Jackson's discipline related to communication issues and the cell phone bill dispute. Trial Tr. 390:2–13, 391:8–20.

64.     Ms. Thao informed Ms. Gulaid that there were some "red flags" in Ms. Jackson's personnel file and she shared her findings with Ms. Gulaid. *Id.* 271:17–273:25, 299:19–300:7, 394:19–25.

65.     Ms. Gulaid was previously unaware of Ms. Jackson's disciplinary history. *Id.* 320:15–17.

66.     The existence of disciplinary issues in Ms. Jackson's file was a "big deal" to Ms. Gulaid, who was new to DHS and still learning to grasp the complexity of disciplinary conflicts between management and staff at the agency. *Id*. 329:7–330:5.

67.     In particular, Ms. Gulaid was concerned that others at DHS in positions of authority over her would be unsupportive of a decision to promote Ms. Jackson to the MHM position because of the disciplinary issues flagged by Ms. Thao. Trial Tr. 276:3–8, 276:10–11. She sought assurances from leadership about Ms. Jackson's record, but she did not receive any response that would guide or make her feel more confident about her choice. *Id*. 276:15–16.

68.     Ms. Gulaid decided not to offer Ms. Jackson the MHM position. Trial Ex. P-67; Trial Tr. 274:15– 18, 306:16–23. In doing so, Ms. Gulaid was the sole decisionmaker. Trial Tr. 275:24–276:18.

69.     On November 13, 2019, Ms. Gulaid told Ms. Jackson that she was not selected for the position because of her discipline for the data overages. Trial Ex. P-58; Trial Tr. 49:19–25, 50:6–17, 121:1–15, 295:3–296:9. Ms. Gulaid told Ms. Jackson that she did not want to deal with collecting repayment of the overages from Ms. Jackson. *Id.* 122:14–19.

70.     After conducting a background check on Ms. Hamilton, Ms. Gulaid decided not to offer the MHM Director position to her, either. *Id*. 270:5–18, 322:9–11.

71.     While Ms. Hamilton was qualified for the job and there were no concerns with her background check, Ms. Gulaid did not feel she possessed the vision necessary to move the MHM program forward. *Id.* 270:11–271:16.

72.     Ms. Gulaid then looked to other candidates who had previously applied and met the position's minimum qualifications but were not initially interviewed. *Id*. 280:3–16.

73.     Ms. Gulaid selected several new candidates to interview for the MHM Director position, including Ms. Petersen. *Id*. 279:18–281:6. Ms. Petersen was one of several applicants who were not initially interviewed but who remained viable candidates based on Ms. Gulaid's review of their resumés. *Id.* 280:21–281:8.

74.     Ms. Petersen had prior experience working both with MHM program participants and in health administration supervisory roles, including at DHS. Trial Ex. P-28; Trial Tr. 286:20–287:4, 337:15–339:24, 372:13–375:8. Ms. Petersen holds a master's degree in public administration. Trial Tr. 335:10–25.

75.     Ms. Gulaid and Ms. Petersen had not met before Ms. Petersen's interview.

*Id*. 286:13–15, 375:9–13.

76.     Ms. Gulaid conducted a round of follow-up interviews, as she had done with the initial group of candidates. *Id.* 324:1–12. Ms. Petersen was among those who received a second-round interview. *Id*. 281:2–15, 323:2–9.

77.     Mr. Pollock participated in Ms. Petersen's second-round interview. *Id.* 469:15–17.

78.     At the conclusion of these interviews, Ms. Gulaid determined that Ms. Petersen was a finalist for the MHM Director position and conducted a background and reference check on her. Exs. P-53, P-57; Trial Tr. 288:2–12.

79.     Ms. Petersen's vision for the future of the MHM program impressed Ms. Gulaid. Trial Tr. 324:13–325:14.

80.     Ms. Gulaid asked Ms. Thao to review Ms. Petersen's DHS personnel file. Trial Ex. 53; Trial Tr. 288:6–12, 396:1–10.

81.     At the time of her review of Ms. Petersen's DHS personnel file, Ms. Thao did not know Ms. Petersen and was unaware of Ms. Petersen's race. Trial Tr. 401:1–6.

82.     Ms. Thao followed the same process in reviewing Ms. Petersen's DHS personnel file that she did in reviewing Ms. Jackson's DHS personnel file. *Id.* 396:6– 15, 401:20–22, 402:1–3.

83.     Ms. Thao reviewed Ms. Petersen's DHS personnel file but did not find anything of concern. Trial Ex. P-59; Trial Tr. 288:6–25, 290:14–291:4, 396:16–397:1.

84.     Ms. Thao subsequently informed Ms. Gulaid on November 13, 2019, that she had not found anything concerning in Ms. Petersen's DHS personnel file. Trial Ex. P-

59; Trial Tr. 288:6–25, 290:14–291:4, 396:16–22.

85.     Unbeknownst to Ms. Thao, Ms. Petersen had received a written reprimand three months earlier—on August 1, 2019—for violating DHS's Respectful Workplace Policy. Trial Ex. P-17; Trial Tr. 354:14–18, 397:18–23, 399:4–11. Ms. Thao testified that she did not find any indication of the reprimand when reviewing Ms. Petersen's file and that she was not otherwise aware of any discipline against Ms. Petersen at the time she reviewed Ms. Petersen's DHS personnel file. Trial Tr. 396:11–397:23.

86.     Ms. Petersen has no other disciplinary history at DHS. *Id.* 375:14–19.

87.     Ms. Petersen had been placed on a lengthy leave of absence prior to being reprimanded, during which time she was the subject of an employment investigation that culminated in the written reprimand. *Id.* 351:4–17, 358:3–4, 411:8–9, 448:15–23.

88.     Records relating to employment investigations are not kept in DHS personnel files, and therefore, Ms. Thao found no indication of the leave or the investigation while reviewing Ms. Petersen's file. *Id.* 388:23–389:7, 390:15–18, 393:2–9, 397:24–398:2, 413:14–17.

89.     Ms. Petersen recalls mentioning during her second-round interview that she had been disciplined. Trial Tr. 370:10–371:5, 376:13–25, 377:14–19.

90.     Ms. Gulaid and Mr. Pollock, who participated in Ms. Petersen's second-round interview, testified that they did not recall Ms. Petersen disclosing that she had been disciplined. *Id.* 289:1–4, 326:10–16, 469:18–470:7.

91.     Ms. Gulaid testified that had no knowledge of Ms. Petersen's investigatory

leave or discipline prior to hiring Ms. Petersen for the MHM Director position. *Id.* 286:9–15, 326:10–20, 332:6–22.

92.     Had Ms. Gulaid known of Ms. Petersen's discipline, she testified that would not have offered Ms. Petersen the MHM Director position. *Id.* 327:19–21, 332:20–22.

93.     Had Ms. Gulaid known of Ms. Petersen's discipline and not offered Ms. Petersen the MHM Director position, she is uncertain whether she would have revisited Ms. Jackson's candidacy or moved on to a new candidate entirely. *Id.* 330:14–331:12.

94.     Ms. Gulaid offered the MHM Director position to Ms. Petersen, and Ms. Petersen accepted on November 15, 2019. Trial Ex. P-60.

95.     Ms. Jackson met with Ms. Gulaid to discuss why she was not selected for the MHM Director job. Trial Tr. 63:14–64:14, 303:5–13.

96.     During this meeting, Ms. Gulaid informed Ms. Jackson that Ms. Petersen had been hired for the position. *Id.* Ms. Jackson asked Ms. Gulaid whether she knew that Ms. Petersen had been on an investigatory leave of absence. *Id.* Ms. Gulaid said she did not and seemed surprised by this information. *Id.*

97.     Ms. Petersen began working as the MHM Director on December 4, 2019. Stip. Facts ¶ 10.

98.     On January 3, 2020, Ms. Jackson met with Ms. Gulaid, Mr. Tolefree, and Connie Jones, who was then DHS's Human Resources Director. Trial Ex. P-77; Trial Tr. 61:1–4, 67:16–21, 124:7–10, 125:1–126:4, 305:13–306:21, 432:22–434:20. The purpose of this meeting was to further discuss why Ms. Jackson was not selected for the MHM

Director position. Trial Tr. 67:16–21, 124:7–10, 125:1–126:4, 305:13–306:21, 432:22–434:20. During this meeting, Ms. Gulaid again indicated that her decision not to hire Ms. Jackson was based on Ms. Jackson's discipline for the data overages. *Id*. Mr. Tolefree's handwritten notes of this meeting state that Ms. Jackson's discipline was a "big deal" for Ms. Gulaid. Trial Ex. P-77; Trial Tr. 433:23–434:17.

## IV. Work Culture at DHS

99.     During the trial, Ms. Jackson testified extensively about her perceptions of the bias and disparate treatment she has experienced while employed at DHS. Other employee witnesses who worked in the Behavioral Health Division with Mr. Jackson testified to similar perceptions and experiences.

100.     Dominique Jones, a black woman who has worked at DHS for seven years and who previously supervised Ms. Jackson, testified that she has experienced differential treatment based on her race. Trial Tr. 144:1–4, 169:8-15, 173:1–15. Ms. Jones testified that she would participate in Behavioral Health Division meetings and be ignored, skipped over, and have her contributions to the discussion dismissed by white employees, whereas suggestions from her white colleagues would be welcomed and validated. *Id*. 161:10–20, 162:21–163:2, 163:24–164:11, 169:18–170:9, 171:6–9.

101.     Ms. Jones also testified that she has observed DHS grant employees' requests to transfer and not be supervised by people of color but deny similar requests when the supervisor is white. *Id.* 164:20–165:24.

102.    Ms. Jones further testified that she has had concerns about whether a candidate's race was a factor in how a DHS hiring panel perceived a candidate. *Id*. 165:25–167:6.

103.    Ms. Jones also disagrees with concerns about Ms. Jackson's communication style. *Id*. 169:8–9, 177:19–178:5, 179:4–10. When Ms. Jones supervised Ms. Jackson, Ms. Jones was often added to email chains and asked about Ms. Jackson's communications, but after reading the communications, Ms. Jones believed that Ms. Jackson was being respectful. *Id.* 180:24–181:6.

104.    Similarly, in Ms. Jackson's 2017 Annual Performance Review, her then–manager, Carole LaBine, acknowledged that Jackson "has had to deal with racism and unreasonable expectations (due to racism) from team members, others in the agency and partners, in her daily work." Ex. P-04 at 351; Trial Tr. 22:23–23:10. Ms. LaBine further wrote that Jackson "can focus on the end goal in order to work through these times with grace and integrity. Deidre is very vocal and I appreciate she is willing to push and question the system." Ex. P-04 at 351.

105.    Jeffrey Hunsberger, who identifies as African American and who recently retired after 26 years at DHS, testified that during his tenure in the Behavioral Health Division, he observed white employees being treated more favorably than black employees in a workplace environment where "two standards existed." Trial Tr. 479:16–19, 482:14, 485:11–486:15, 490:8–10; *id*. 482:20–22, 482:16-18, 492:2–12.

106.     Mr. Hunsberger testified that he experienced hostile treatment from a white supervisor who spoke to him in a condescending way, trying to "establish intellectual superiority," which Hunsberger believed was related to his race. *Id*. 487:5-20.

107.     Patina Thomas, a black supervisor in the Behavioral Health Division with Ms. Jackson, who has worked at DHS for nine years, described the culture in the Division as "toxic." *Id*. 495:14-21, 496:11, 502:12-13.

108.     Ms. Thomas has observed that DHS employees experience differential treatment based on their race. *Id*. 498:3-499:9.

109.     She further testified that she has observed this disparate treatment as a hiring manager during DHS' hiring processes, particularly with respect to salary offers, and she described incidents in which she had to push for DHS to approve salary offers for black candidates at levels consistent with previously hired white candidates. *Id*. 502:19–505:7.

110.     Ms. Thomas also testified about her belief that less-qualified white candidates were more likely to receive promotions at DHS. *Id*. 505:8-506:8.

111.     Finally, Ms. Gulaid testified that she secured a monetary settlement of a claim of race-based discrimination she made against DHS related to the elimination of her position in 2020 and her own unsuccessful attempt to secure a different position within the agency. *Id*. 309:2–313:5.

## FINDINGS OF LAW

### I.     Legal Standard

112.     Ms. Jackson's claim arises under Title VII of the Civil Rights Act, which

makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a).

113.    Such a violation of Title VII occurs when a plaintiff "demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." Id. § 2000e–2(m).

114.    Ms. Jackson claims she was denied promotion to the MHM Director position because she is black. Her failure–to–promote claim is the sole claim that survived summary judgment. *See* ECF 153 at 1.

115.    "A plaintiff may prove unlawful racial discrimination through either direct or circumstantial evidence." *Lucke v. Solsvig*, 912 F.3d 1084, 1087 (8th Cir. 2019).

116.    Where, as here, a plaintiff seeks to support her discrimination claim through circumstantial evidence, "she must proceed under the framework laid out in *McDonnell Douglass Corp. v. Green*." *Id*. (citing *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973)).

117.    To establish a prima facie failure–to–promote case, a plaintiff must show that "(1) she is in a protected class; (2) she was qualified for an open position; (3) she was denied that position; and (4) the [employer] filled the position with a person not in the same protected class." *Torgerson v. City of Rocheste*r, 643 F.3d 1031, 1046 (8th Cir. 2011) (quoting *Dixon v. Pulaski County Special Sch. Dist.*, 578 F.3d 862, 867–68 (8th Cir. 2009).

118.    Thereafter, under *McDonnell Douglas*, the burden shifts to the defendant,

20

who "must show a 'legitimate, non–discriminatory reason' for the challenged conduct." *Lucke*, 912 F.3d at 1084 (quoting *Young v. Builders Steel Co.*, 754 F.3d 573, 577–78 (8th Cir. 2014)).

119.    If the defendant articulates such a reason, the burden returns once again to the plaintiff to show that the defendant's reason is pretextual "and that discrimination was the real reason" for the employer's conduct. *Id.* at 1088 (quotation omitted).

120.    A plaintiff may show pretext by establishing that an "employer's explanation is unworthy of credence because it has no basis in fact." *Torgerson*, 643 F.3d at 1047 (cleaned up).

121.    Or a plaintiff may show pretext "by persuading the court that a prohibited reason more likely motivated the employer." *Id*. (cleaned up).

122.    "Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action." *Id*.

123.    In its summary judgment order, the Court concluded that Ms. Jackson had established a prima facie case and shifted the burden to DHS to articulate a legitimate, non–discriminatory reason for failing to promote her. *See* ECF 153 at 7–8.

124.    The evidence at trial further supports that conclusion. First, it remains undisputed that Ms. Jackson is a member of a protected class, specifically that she is a black woman and African American. Second, testimony establishes that she was qualified for the promotion she sought. Ms. Jackson was advanced unanimously to the interview round for the MHM position and was Ms. Gulaid's top pick for the role. No testimony or evidence suggests that any person had objective concerns about Ms. Jackson's

21

qualifications for the position. Third, it remains undisputed that Ms. Jackson was not promoted. Fourth, it remains undisputed that Ms. Petersen, who was promoted instead, is a white woman.

125.     Also in its summary judgment order, the Court concluded that DHS had met its subsequent obligation to articulate a legitimate, non–discriminatory reason for failing to promote Ms. Jackson. *See id*. at 8.

126.     The evidence at trial also supports this conclusion. The trial testimony of several witnesses, and in particular of Ms. Gulaid, is consistent with DHS's long–proffered non–discriminatory basis that Ms. Jackson was not promoted because of the issues flagged in her personnel file, especially the cellphone bill dispute.

127.     Finally, this Court found in its summary judgment order that Ms. Jackson had presented questions of triable fact as to whether DHS's legitimate, non–discriminatory reason for failing to promote her was a mere pretext for racial discrimination against her and the desire to hire a white candidate in her place. *See id*. at 9.

## II.     Failure to Prove Pretext

128.     Based on the evidence at trial, Ms. Jackson has failed to prove pretext.

129.     First, Ms. Jackson has failed to prove pretext because she has failed to establish that DHS's explanation "is unworthy of credence because it has no basis in fact." *Torgerson*, 643 F.3d at 1047 (cleaned up). Indeed, evidence at trial suggests a strong factual basis to back up DHS's non-discriminatory explanation.

130.     The evidence shows that Ms. Gulaid was the sole decisionmaker in deciding not to promote Ms. Jackson.

131.     Evidence also overwhelmingly supports the conclusion that, in her capacity as the decisionmaker, Ms. Gulaid declined to offer Ms. Jackson the promotion because she was informed by Ms. Thao that Ms. Jackson's file had revealed "red flags," and in particular, that Ms. Jackson was in an ongoing dispute with DHS over a cell phone bill that exceeded $7,000.

132.     To be sure, there is nothing straightforward about Ms. Jackson's dispute with her employer over the cellphone bill. Ms. Jackson's testimony raised legitimate questions about her culpability for the data overages that led to this dispute with her employer. And Ms. Gulaid's testimony reveals that she was frustrated and confused by her own lack of guidance about what significance to place on Ms. Jackson's discipline over the bill when considering her candidacy. Simply put, it seems possible that the cell phone bill may have determined the outcome of Ms. Jackson's promotion decision in a way that was, in the general sense, unfair to Ms. Jackson. But the cell phone bill is not on trial in this case. Absent evidence that the existence of the cellphone bill dispute was itself grounded in racial discrimination against Ms. Jackson, the fact that there may be reasonable disagreement over whether Ms. Jackson ought to be blamed and/or held responsible for the data overage is not relevant to the outcome of her Title VII claim.

133.     Setting aside the bureaucratic complexity of its merits, there is also no evidence to suggest that the cell phone dispute was used as pretext for racial

discrimination.

134.    There is no evidence that anyone influenced or controlled Ms. Thao when she flagged the cell phone dispute to Ms. Gulaid and no evidence that Ms. Gulaid was influenced or controlled by anyone else in how to interpret the dispute's significance to Ms. Jackson's candidacy.

135.    Instead, the evidence at trial supports the conclusion that neither Ms. Thao nor Ms. Gulaid had any preexisting knowledge about the dispute, that Ms. Thao came to know about the dispute through her routine review of Ms. Jackson's personnel file, and that upon learning about the dispute from Ms. Thao, Ms. Gulaid accepted the information at face value—meaning she accepted as true that Ms. Jackson was involved in a dispute with the agency over thousands of dollars in cell phone bills—without outside influence.

136.    Finally, there is no evidence to support the conclusion that Ms. Gulaid independently seized on the cell phone dispute as a pretext for her own discriminatory desire not to promote Ms. Jackson or that Ms. Thao flagged the dispute to Ms. Gulaid out of her own discriminatory desire to harm Ms. Jackson's candidacy.

137.    The most likely conclusion then is that knowledge of the cell phone bill, coupled with the other items flagged in Ms. Jackson's file, led Ms. Gulaid to grow nervous about offering Ms. Jackson the promotion. Indeed, Ms. Gulaid, who was relatively new to DHS and a political appointee, explicitly testified about these concerns. She credibly testified that she sought assurances from DHS leadership that the items in Ms. Jackson's file were "not a big deal" and that "someone will back me up if I take that step [of

promoting Ms. Jackson despite of them].” Trial Tr. 276:3–8; *see also id*. 276:10–11

(“[W]hat I was looking for was like support.”). And when she did not receive any response

from leadership, one way or the other, she took the cautious approach and decided to not

promote Ms. Jackson. *Id*. 276:15–16 (credibly testifying that she concluded that, “I can't

move forward without someone else signing off and saying it's not a big deal”).

138.    Having failed to demonstrate that DHS’s proffered non-discriminatory

reason for not promoting her was factually baseless, the evidence at trial has also failed

to “persuad[e] the court that a prohibited reason more likely motivated” DHS. *Torgerson*,

643 F.3d at 1047 (cleaned up).

139.    One basis by which this Court could be persuaded that race, rather than her

personnel file, was the more likely reason that Ms. Jackson did not receive the MHM

position is that Ms. Petersen, a white woman who had her own disciplinary record at DHS,

was promoted instead. *See King v. Hardesty*, 517 F.3d 1049, 1063 (8th Cir. 2008),

*abrogated on other grounds by Torgerson*, 643 F.3d 1031 (“Instances of disparate

treatment can support a claim of pretext.”). Indeed, this apparent disparate treatment

strongly informed the Court’s decision to allow Ms. Jackson’s failure–to–promote claim

to proceed to trial. *See* ECF 153 at 12–14.

140.    But the evidence at trial concerning Ms. Petersen’s selection does not

support the conclusion that the likely basis for DHS’s failure to promote Ms. Jackson was

its desire to hire a white woman instead.

141.    Most crucially, the trial evidence reveals that Ms. Jackson’s rejection and

Ms. Petersen's selection were fairly attenuated. Initially, Ms. Jackson was Ms. Gulaid's clear favorite for the promotion, a fact that Ms. Gulaid shared with Ms. Jackson and others. This fact alone weighs strongly against the notion that a Ms. Gulaid had the discriminatory intent to deny her the promotion because of her race. *See Barnes v. Bd. Of Trustees of Univ. of Ill.*, 946 F.3d 384, 390 (7th Cir. 2020) (finding no pretext where decisionmaker actively encouraged members of plaintiff's protected class to apply for position). And there is no evidence that Ms. Gulaid had *any* candidate in mind, let alone Ms. Petersen or another white person, when she reversed course on Ms. Jackson's candidacy. Indeed, before going back to the drawing board in terms of candidates, Ms. Gulaid initially declined to offer the MHM director position to Ms. Jackson's original co–finalist, who is white.

142.    Further, even if Ms. Petersen had been hired immediately after Ms. Jackson was removed from consideration, the Court would not find that it was persuaded that the more likely basis for DHS's failure to promote Ms. Jackson was due to racial discrimination.

143.    First, Ms. Thao credibly testified that she was unaware of Ms. Jackson's and Ms. Petersen's races when she reviewed their respective DHS personnel files.

144.    Second, Ms. Gulaid credibly testified that she did not know of Ms. Petersen's disciplinary record when she hired Ms. Petersen for the position and testified credibly that she would not have hired Ms. Petersen had she known about it.

145.    While it is true that Ms. Petersen credibly testified that she disclosed her

suspension during her second-round interview with Ms. Gulaid and Mr. Pollock, both Ms. Gulaid and Mr. Pollock credibly testified that they had no recollection of that disclosure.

146.    Ms. Jackson is understandably frustrated that Ms. Gulaid ultimately became aware of disciplinary issues in her personnel file but not in Ms. Petersen's. However, the evidence nevertheless supports the conclusion that this was a genuine oversight. Ultimately, "[t]he fact that [Ms. Gulaid's] decision may have been uninformed is not evidence that it was motivated by racial animus." *Gold Star Taxi & Transp. Serv. v. Mall of Am. Co.*, 987 F. Supp. 741, 751 (D. Minn. 1997).

147.    A final basis by which the Court might be persuaded that race was the more likely basis for DHS's failure to promote Ms. Jackson lies in the testimony of herself and others about their experiences of racial prejudice at DHS. This testimony is often referred to as "me too" evidence and can inform a conclusion of pretext in racial discrimination cases. *See Callahan v. Runyun*, 75 F.3d 1293, 1298 (8th Cir. 1996) (evidence of other, unrelated instances of discrimination may "assist in the development of a reasonable inference of discrimination within the context of each case's respective facts") (quoting *Bradford v. Norfolk S. Corp.*, 54 F.3d 1412, 1419 (8th Cir.1995); *Hawkins v. Hennepin Tech. Ctr.*, 900 F.2d 153, 156 (8th Cir. 1990) ( "[B]ackground evidence [of discrimination] may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive.").

148.    Indeed, the "me too" testimony in this case was broadly credible and paints a picture of DHS during the time in question as an environment in which black employees

routinely feel marginalized relative to their white colleagues. However, this testimony simply does not sufficiently support the theory that racial discrimination led to the specific failure to promote Ms. Jackson at issue in this case.

149.    Here, Ms. Jones, Mr. Hunsberger, Ms. Thomas, and Ms. Jackson each testified credibly to instances in which they felt that white colleagues had treated them or other black colleagues with disrespect or prejudice, or in which small disciplinary matters had been unfairly escalated against them, or in which white colleagues had gotten away with behavior that black colleagues would not have. Ms. Jones and Ms. Thomas also provided testimony that they believe race has played a part in hiring and/or salary decisions at DHS.

150.    But notably, none of these witnesses testified to specific instances of alleged racial discrimination in hiring or promoting at DHS, other than Ms. Jackson's testimony concerning herself. Instead, what these witnesses provided was credible subjective experiences and perceptions. But the anecdotal value of this evidence to the outcome of Ms. Jackson's Title VII case is diminished by the fact that three of the four witness who testified to experiences of racism at DHS—Ms. Jackson, Ms. Jones, Ms. Thomas—were nevertheless promoted into supervisory roles at the agency. Moreover, this trial also featured testimony from Ms. Gulaid, a black woman in a supervisory role at DHS, and testimony about Ms. Giles, another black woman in a supervisory role.

151.    Ultimately, though the very troubling evidence in this case shows that numerous black employees experienced racial prejudice and biased attitudes at their

workplace, that evidence does not overcome the specific, non-discriminatory reasons that Ms. Jackson was not promoted.

## ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, **IT IS HEREBY ORDERED** that judgment be entered for Defendant Minnesota Department of Human Services and against Plaintiff Deidre Sherell Jackson.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date: July 31, 2024                    *s/ Katherine M. Menendez*
                                       Katherine M. Menendez
                                       United States District Judge

29